1

2

3

4              UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7   UNITED STATES OF AMERICA,                    No. CR 10-0348 MHP

8              Plaintiff,
                                                 **MEMORANDUM & ORDER**
9     v.
                                                 **Re: ORDER DENYING THE**
10  CARLOS ASPRILLA,                             **DEFENDANT'S MOTION TO SUPPRESS**
                                                 **EVIDENCE**
11             Defendant(s),
                                         /
12

13          The parties appeared before the Honorable Marilyn Hall Patel on February 16, 17, and 18

14  for an evidentiary hearing and argument on the defendant's motion to suppress evidence.  The

15  defendant was present and represented by CJA panel counsel Deborah G. Levine.  The government

16  was represented by Assistant United States Attorney Brian Lewis.

17          Defendant seeks suppression of the evidence seized on November 24, 2009 during his arrest

18  and the subsequent search of 1217 Ingalls Street.  The defendant argued that officers lacked (i)

19  reasonable suspicion to detain and search him and (ii) probable cause to believe that he lived at 1217

20  Ingalls Street.  The government opposed the motion, arguing that the detention and search of the

21  defendant and the search of 1217 Ingalls Street were reasonable and lawful and that the defendant's

22  motion should be denied.

23          Sergeant Daniel Manning and Officer Ramon Reynoso of the San Francisco Police

24  Department testified.  Exhibits were admitted which included photos of the area at and around 1217

25  Ingalls Street.  The defendant submitted a declaration, but did not testify, nor did he call any other

26  witnesses.[1]

27          At the conclusion of the hearing and upon consideration of the testimony and exhibits

28  received by the Court and the arguments made by the parties, the Court denied the defendant's

1   motion from the bench.  The Court now supplements that ruling with the below written factual

2   findings and order denying the defendant's motion.

3   BACKGROUND

4        San Francisco Police Department (SFPD) Sergeant Daniel Manning of the Gang Task

5   Force, within a month prior to the beginning of this investigation, received information from a

6   confidential informant that a West Mob gang member named "Carlos" had a gun.  According to

7   the informant, "Carlos" was a 22-year-old, darkly complected black male who went by the nickname

8   "Cuban".  The informant stated that "Carlos" lived with his girlfriend off of Ingalls Street in an

9   apartment just below a parking lot, and that "Carlos" drove a white Lexus and the girlfriend drove a

10  black Pontiac GTP.  SFPD Inspector Daniel Silver, also assigned to the Gang Task Force,

11  investigated further.  Inspector Silver knew of a West Mob Gang member named Carlos Asprilla and

12  also discovered that Asprilla had an active warrantless search condition related to a felony probation

13  term stemming from a drug possession arrest and conviction in 2008.  The search condition was

14  recorded as valid through August 31, 2012.

15       On November 13, 2009, Inspector Silver and FBI Special Agent Millspaugh performed

16  independent investigation to corroborate the informant's tip.  They observed Asprilla driving a

17  black Pontiac GTP (California license plate no. 6JHU074) on Cashmere St., which is about 5 or

18  6 blocks from 1217 Ingalls Street in the Bayview neighborhood in San Francisco.  Asprilla parked

19  the car in a driveway, where a white Lexus (California license plate no. 6KBV089) was also located.

20  Records checks indicated that the white Lexus was registered to Carlos Asprilla at 2345 Market St.

21  in Oakland and the black Pontiac GTP was registered to Tashara White at 1217 Ingalls Street in San

22  Francisco.  Inspector Silver and Agent Millspaugh then drove to 1217 Ingalls Street and viewed the

23  residence, which matched the physical description given by the informant, namely that it was below

24  a parking lot.  The black Pontiac GTP was later observed parked at 1217 Ingalls Street.

25       On November 24, 2009, after verifying details of the tip provided by the informant,

26  beginning around 9 a.m., Sergeant Manning staked out 1217 Ingalls Street in an attempt to locate

27  Asprilla in order to conduct a probation search. He positioned his unmarked vehicle in such a

28  manner as to view the entrant to the apartment from the vehicle's rear windows.   Around 11 a.m.,

1   two women and a baby arrived

2   at the residence in the black Pontiac GTP.  The women unloaded some items from the car and

3   went down the stairs to the apartment.  Then, at around 11:30 a.m., a male, later identified as

4   Demarie Joubert, walked up to the apartment and stood outside.  He was let in by another male

5   who briefly stood in the doorway.  Sergeant Manning called for back-up, and various officers

6   responded, setting up a perimeter around the apartment.  Around 11:48 a.m., the front door opened,

7   and Joubert and Asprilla walked out of the apartment.  Sergeant Manning instructed Officer Ramon

8   Reynoso and his partner, who had responded to the request, to set up a perimeter, go to the end of

9   the parking lot and down a path that would lead to where Joubert and Asprilla were walking as they

10  left the apartment. Officer Ramon and his partner were in a marked police car and full police

11  uniform. Sergeant Manning got out of his surveillance vehicle and went down a staircase that led

12  from the parking lot to the apartment building below.  Officer Reynoso and his partner descended

13  the staircase at the end of the parking lot to the apartment building below.

14      When Officer Reynoso turned the corner, he saw Asprilla and Joubert initially walking

15  toward him, but then quickly turn around and begin to walk back to the apartment and away from

16  the officers.  As Asprilla and Joubert walked back to the apartment, they began to pick up their

17  pace.  Officer Reynoso, who was assigned to this area of the city and knew Asprilla from

18  numerous prior encounters, called out to him, "Carlos, stop.  We want to talk to you."  As Sergeant

19  Manning emerged from the staircase, he saw Joubert and Asprilla walking away from Officer

20  Reynoso and his partner and approaching the apartment.  Sergeant Manning called out "Police.

21  Stop.  Come here."  But, Asprilla ignored those requests and pulled keys from his pocket, quickly

22  putting one key in the front door of the apartment.  Sergeant Manning instructed Asprilla: "Don't

23  open the door."  Asprilla disregarded Sergeant Manning, turned the key unlocking the door, and

24  tried to get inside the apartment.  Sergeant Manning followed behind yelling "Police.  Stop."

25  Asprilla turned and faced Sergeant Manning and with both hands attempted to slam the door in the

26  officer's face.  Sergeant Manning blocked the door with his arms, suffering lacerations and bruising

27  to his elbows and a cut to his hand when Asprilla forcefully swung the door at the officer.

28      Asprilla then entered the apartment, and Sergeant Manning attempted to grab him.  As

1  Sergeant Manning attempted to wrap his arms around Asprilla, both men fell down in the entryway

2  of the apartment.  Asprilla got up and tried to head down a flight of stairs.  Sergeant Manning caught

3  up to Asprilla and tackled him on a landing of the staircase.  Officer Reynoso, who had entered the

4  house after Manning and Asprilla, joined the struggle on the landing and attempted to help subdue

5  Asprilla.  As the struggle continued, all three men fell down the flight of stairs.  During the tussle,

6  Asprilla was throwing elbows at the officers and attempting to get away.  As the men crashed at the

7  bottom of the flight of stairs, Sergeant Manning grabbed Asprilla's left arm and pulled it behind

8  Asprilla's back.  Asprilla continued to struggle with the officers, attempting to reach his hands

9  towards his waistband area.  At that moment, Sergeant Manning observed a large capacity magazine

10 to a firearm hanging out from Asprilla's jacket.  Sergeant Manning immediately took action to

11 subdue Asprilla, and the magazine fell out of Asprilla's jacket and onto the ground.  Asprilla was

12 then placed in handcuffs.  The magazine that fell from Asprilla's jacket was loaded with 18 rounds

13 of ammunition.  A search of Asprilla's waistband revealed a .45 caliber Glock semi-automatic pistol

14 that was loaded with a single round in the chamber.  A later search of the house revealed another

15 magazine for a .45 caliber Glock pistol in a jacket located in a closet in the apartment.

16

17 LEGAL STANDARD

18      A police officer may lawfully stop an individual if the officer has a reasonable suspicion

19 supported by articulable facts that criminal activity may be occurring.  *United States v. Sokolow*,

20 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  Specific articulable facts,

21 together with reasonable inferences from those facts that criminal conduct is afoot, form a sufficient

22 basis for an investigatory stop.  *Id.* at 21-24.  In addition, an individual on probation with a

23 warrantless search condition may be stopped, searched, and have his residence searched if

24 reasonable suspicion exists to believe that criminal activity may be occurring.  *See United States v.*

25 *Knights*, 534 U.S. 112, 121 (2001) ("no more than reasonable suspicion" is necessary to search the

26 home of probationer with a search condition).  However, officers must have probable cause to

27 believe that the residence to be searched is the probationer's residence.  *See United States v.*

28 *Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006).

1    In order to determine whether reasonable suspicion exists, a court must consider the

2  totality of the circumstances and the probability, rather than the certainty, of criminal conduct.

3  *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also Sokolow*, 490 U.S. at 8-10 (holding

4  reasonable suspicion depends on the "totality of the circumstances—the whole picture" and that

5  several presumably innocent facts may, when considered together, add up to reasonable suspicion).

6  The officer must be aware of "specific, articulable facts which, when considered with objective and

7  reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-*

8  *Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (quoting *Cortez*, 449 U.S. at 418).  Reasonable

9  suspicion is determined from the perspective of an experienced law enforcement officer.  *See United*

10 *States v. Alvarez*, 899 F.2d 833, 837 (9th Cir. 1990).

11    Importantly, flight from the police is a pertinent factor in determining reasonable

12 suspicion.  *See Illinois v. Wardlow*, 528 U.S. 119 (2000); *see also United States v. Garcia-Barron*,

13 116 F.3d 1305, 1308 (9th Cir.1997) (holding reasonable suspicion existed when persons in a van

14 ducked "out of sight, apparently hiding," among other factors).  Further, a tip from a confidential

15 informant, corroborated by independent police work for sufficient indicia of reliability, also

16 contributes to the existence of reasonable suspicion.  *See United States v. Zazueta*, 1995 WL

17 370341, *1 (9th Cir. June 21, 1995).

18

19 DISCUSSION

20 I.    Reasonable Suspicion Existed to Believe that the Defendant was Engaged in

21     Criminal Activity

22    At the time the defendant was seized, officers had three critical pieces of information that

23 gave rise to reasonable suspicion that the defendant was engaged in criminal activity: (i) a recent tip

24 from a confidential informant that the defendant had a gun, (ii) the defendant's known gang

25 affiliation, and (iii) the defendant's flight from authorities.[2]

26    Firstly, Sergeant Manning received a tip within the previous month that a gang member

27 named Carlos had a gun.  The informant identified Carlos as a young black male in his early

28 twenties.  According to the informant, Carlos drove a white Lexus and lived with his girlfriend,

1  who drove a black Pontiac GTP, on Ingalls Street in an apartment just below a parking lot.  Law

2  enforcement officers independently confirmed almost all of the details of the informant's tip.

3  Inspector Silver knew of a gang member named Carlos Asprilla and discovered that Asprilla was

4  on probation with a warrantless search condition due to a recent criminal conviction.  During

5  surveillance on November 13, 2009, officers observed the defendant driving a black Pontiac GTP

6  about 5 or 6 blocks from 1217 Ingalls Street.  The Pontiac was registered to a woman at 1217

7  Ingalls Street.  In addition, the defendant parked the Pontiac next to a white Lexus that was

8  registered to him.  Further, the Pontiac that the defendant had been seen driving was also later

9  seen parked at 1217 Ingalls Street.  Finally, 1217 Ingalls Street matched the physical description

10  given by the informant.  The details of the informant's tip all checked out after investigation by

11  the police.  As the Supreme Court explained, the officers could reasonably believe that "because

12  an informant is shown to be right about some things, he is probably right about other facts that he

13  has alleged, including the claim that the object of the tip is engaged in criminal activity." *Alabama*

14  *v. White*, 496 U.S. 325, 331 (1990).  As such, the tip that the defendant was in possession of a

15  firearm, many details of the tip verified by officers as true, contributed to a reasonable suspicion that

16  the defendant was engaged in criminal activity.[3]

17      Secondly, the defendant's known gang affiliation also contributed to facts available to the

18  officers that reasonable suspicion existed that the defendant was engaged in criminal activity.  The

19  nexus between guns and gangs is well-known.  Further, Sergeant Manning testified that in his

20  experience gang members carry guns to protect their turf from other gangs and to otherwise further

21  the objectives of the gang, which often includes engaging in narcotics trafficking and

22  other criminal activity.

23      Finally, when the defendant, who was on probation with a warrantless search condition,

24  realized that officers were approaching him he turned and tried to get away.  "Headlong

25  flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of

26  wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124

27  (2000).  It was clear that the officers made their presence known to the defendant.  Two of them

28  were in uniform and at least one was known to the defendant.  Officer Reynoso called out to Carlos

1  by name and told him to stop.  Sergeant Manning identified himself as a police officer and told

2  defendant to stop before the defendant attempted to enter the apartment.   Where, as here, the

3  defendant was on probation with a warrantless search condition, a fact known to the officers, flight

4  is particularly suggestive of wrongdoing.[4]

5         Taken together these factors (the tip that the defendant had a gun, the defendant's gang

6  membership, and the defendant's flight from authorities) gave rise to a reasonable suspicion that

7  the defendant was engaged in criminal activity at the time he was seized by SFPD officers.

8

9  II.         Probable Cause Existed to Believe that the Defendant Resided at 1217 Ingalls Street

10         In cases concluding that probable cause exists to believe a probationer resides at a

11  particular address, the Ninth Circuit has observed that certain patterns clearly emerge.[5]  *See*

12  *Howard*, 447 F.3d at 1265.  In *Howard*, the Ninth Circuit explained that the cases where it upheld

13  searches of residences not reported by a parolee all contained the following factors: (i) the parolee

14  did not appear to be residing at any address other than the one searched; (ii) officers directly

15  observed behavior that gave officers good reason to suspect the parolee lived at the residence

16  searched; and (iii) the parolee possessed and/or used a key to the searched residence.  *Id*. at 1265-66.

17  Applying these factors in the context of a probationer, the facts of this case meet all of these factors.[6]

18         The defendant did not appear to be residing at any residence other than 1217 Ingalls

19  Street.  The tip from the informant, many details of which the officers verified, indicated that the

20  defendant resided on Ingalls Street.  Further, the defendant was observed within 5 or 6 blocks of

21  1217 Ingalls Street driving a car registered to that exact address.  The defendant counters that

22  officers had information that Tashara White lived at 1217 Ingalls Street, and that this information

23  suggested that the defendant did not reside there.  *See* Def. Mot. at 6.  That simply is not so.  In fact,

24  that information actually was more suggestive that the defendant did live at 1217 Ingalls Street

25  because it corroborated the tip by the informant that the defendant lived there with his girlfriend.

26  The defendant also asserts that the existence of probable cause is undermined because his reported

27  probation address was in Oakland and his car was also registered to the same Oakland address.  *Id*.

28  However, the incentive of a probationer with a warrantless search condition to list an address other

1  than his actual one in state records is obvious.  Indeed, an experienced officer may have understood

2  the fact that the defendant was using an Oakland address as an indication that it was more likely that

3  the defendant was involved in criminal activity at his residence on Ingalls Street.  Here, Sergeant

4  Manning testified that it was not uncommon for probationers with search conditions to give incorrect

5  addresses.  In any event, a probationer may simply have multiple residences.[7]  The fact that Asprilla

6  reported an address in Oakland (and even if it was a residence of his) does not mean that he did not

7  reside at 1217 Ingalls Street, where officers had observed him in the residence or that neighborhood

8  on multiple occasions.  On November 13, 2009, officers directly observed the defendant driving in

9  the black Pontiac GTP registered to 1217 Ingalls Street close to that address.  The officers also

10  observed the defendant within the address on November 24, 2009.  Finally, as the defendant fled

11  from the officers, they also observed him remove keys from his pocket and use them to open the

12  door to 1217 Ingalls Street.

13       Because the defendant was known to live at 1217 Ingalls Street, was personally observed

14  by officers in and around 1217 Ingalls Street, and was personally observed in possession of and

15  using a key to enter 1217 Ingalls Street, probable cause existed to believe he lived there.

16

17  III.     Probable Cause Existed to Arrest the Defendant and Search Him Incident to that

18           Arrest

19       Finally, in addition to having reasonable suspicion sufficient to support the execution of

20  the defendant's warrantless search condition, probable cause and exigent circumstances existed

21  to arrest the defendant and to enter 1217 Ingalls Street to do so.  By fleeing and slamming the

22  door on Sergeant Manning's arm, the defendant committed the offense of resisting and obstructing

23  an officer in violation of California Penal Code § 148.  Because the officers had a tip that the

24  defendant may be armed and the defendant fled from the officers who approached him and requested

25  that he stop, exigent circumstances existed justifying the officers' entry into the residence to arrest

26  the defendant.  *See, e.g., United States v. Lindsey*, 877 F.2d 777, 780-83 (9th Cir. 1989) (denial of

27  motion to suppress fruits of home search affirmed where probable cause and exigent circumstances

28  existed to arrest defendant and enter his home to search it).  As Sergeant Manning testified, an

1  armed suspect behind a closed door would present a potentially deadly threat to the officers.  As

2  such, the search in this case also qualifies as a lawful search incident to the defendant's arrest for

3  which exigent circumstances justified the officers entry into the residence.

4

5  <u>CONCLUSION</u>

6      For all the aforementioned reasons, the Court denies the defendant's motion to suppress.

7      IT IS SO ORDERED.

8

9  Dated:  March 8, 2011

10                             MARILYN HALL PATEL
                           United States District Court Judge
                           Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ENDNOTES**

1. The court also requested a copy of the order containing the conditions of probation. That document was submitted and, since it is an authenticated copy of the court's order, this court takes judicial notice of it. The pertinent condition of defendant's grant of probation and which he accepted as a condition of being placed on probation provides as follows:

> "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probations officer."

2. This court notes that the law is unsettled whether reasonable suspicion is required to search a probationer under warrantless search conditions. In *United States v. Knights*, 534 U.S. 112, 120 n.6, 122 (2001), the Supreme Court held that "the warrantless search of Knights [a probationer], supported by reasonable suspicion and authorized by condition of probation, was reasonable within the meaning of the Fourth Amendment," but did not "address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion." In *Samson v. California*, 547 U.S. 843, 850 (2006), the Supreme Court addressed "the question [unaddressed in *Knights*] whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation", "albeit in the context of a parolee search." The Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id*. at 857. However, nether the Supreme Court nor the Ninth Circuit has explicitly held that reasonable suspicion is or is not a required condition to search probationers under warrantless search conditions. In *Samson*, the Supreme Court stated that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. *Id*. at 850. However, in *United States v. Lopez*, 474 F.3d 1208, 1214 n.6 (9th Cir. 2007) (citation and internal quotation marks omitted), the Ninth Circuit stated that it "[has] consistently recognized that there is no constitutional difference between probation and parole." Nonetheless, this court finds it unnecessary to resolve this question here because the search in this case was also supported by reasonable suspicion.

3. The fact that the tip was given within a month does not undermine its contribution to reasonable suspicion that the defendant was currently engaged in criminal activity. *See, e.g. United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995) (finding criminal activity indicating illicit firearm possession within the past 6 weeks supported probable cause for warrant.

4. The defendant's flight is properly considered towards reasonable suspicion because he was not seized until he was physically subdued by officers. *See United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992).

5. This probable cause standard necessarily applies to probationers' searches as well as parolees'. *United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010).

6. An unresolved question is the treatment of the term "premises" for the purpose of the conditions of probation in this case. The condition contained in the order does not use the term "home" or "residence" as in the *Howard* case where a condition of the defendant's supervised release permitted a warrantless search of "his residence, person, property and automobile." 447 F.3d at 1262. Hence, the *Howard* court's focus was on whether the apartment searched was the defendant's "residence." *Id*. "Premises" appears to have a broader reach than "residence". Nonetheless, the words appear to be used somewhat interchangeably and it would appear that in either case probable cause indicia of defendant's residing in or having some control over the "premises" is required. *See, e.g., Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005); *United States v. Ortiz-Villa*, 111 F.3d 139 (9th Cir. 1997). In the end, the result in this case is the same.

7. "[F]or Fourth Amendment purposes, a person can have more than one residence[.]"  *Case v. Kitsap County Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001) (citing *United States v. Risse*, 83 F.3d 212, 217 (8th Cir. 1996)).